THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JOHN M. DUNN and DANIEL GENTILE, Defendants.

Court of General Sessions of County of New York, October 18, 1948.

*Hyman Barshay* for John M. Dunn, defendant.

*Sol Price* for Daniel Gentile, defendant.

*Frank S. Hogan, District Attorney (George Monaghan* of counsel), for plaintiff.

DONNELLAN, J. The defendants, John M. Dunn, Daniel Gentile and Andrew Sheridan were indicted on January 31, 1947, charged with the crime of murder in the first degree for the killing of Anthony Hintz.

After a trial with a special panel of jurors which lasted thirteen days, they were convicted on December 31, 1947, of murder in the first degree. On appeal taken, the said conviction was affirmed unanimously by the Court of Appeals (293 N. Y. 564) and subsequent to that time an application was made on their behalf for a stay to the United States Supreme Court which was denied.

A motion is now made on behalf of Dunn and Gentile to set aside their conviction and for a new trial on the ground of newly discovered evidence. The motion is based upon an affidavit made by the defendant Andrew Sheridan, and at the request of counsel the said Sheridan was produced in court to give testimony under oath in connection with the said motion.

In substance Sheridan testified that he had never heretofore informed Dunn or Gentile of the contents of the affidavit upon which the motion is made or as to the testimony which he was about to give in support of the said motion.

His affidavit and testimony are to the effect that he personally was not present at 61 Grove Street at twenty minutes of eight on the morning of January 8, 1947, at which time Anthony Hintz was shot but that he had planned the killing of Hintz with one John Duff and Jeff La Porte and that neither John Dunn nor Daniel Gentile, these defendants, had anything to do with the said murder and knew nothing of it.

Pictures of John Duff and Jeff La Porte were produced by the District Attorney at the request of the defense for the purpose of making comparisons with the pictures of Dunn and Gentile which were also produced on this motion.

In his affidavit and in his testimony Sheridan described in minute detail the circumstances of the killing. His testimony in this respect corroborates in some of the minutest details the dying declarations made by Hintz, but Sheridan substitutes John Duff in the place of himself as an actual participant in the shooting and for John Dunn he substitutes Jeff La Porte.

In his dying declarations, Hintz stated that he knew all three of the said defendants, namely, Dunn, Sheridan and Gentile for a long period of time along the water front. The question as to whether or not Hintz had the opportunity at the time of the shooting to positively identify his assailants becomes most material.

Hintz lived on the third floor of 61 Grove Street and, as he descended the steps from his apartment to a landing midway between the floor on which he resided and the floor below on his way to work, was ambushed.

The testimony produced upon the trial showed that the sun was shining at the time of the assault and that on the said landing there is a large window which faces east and ceiling lights were lit at the time. There were no obstructing buildings between 61 Grove Street to the east, the adjacent corner building being a one-story taxpayer and Hintz living in the third-floor apartment.

During the course of the trial, no application was made by any of the defendants for an order to permit the jury to inspect the scene of the alleged crime. Immediately after the shooting the defendant, Gentile, disappeared and was not seen until he surrendered to the police on March 31, 1947. The defendant, Sheridan, went to Florida and when his whereabouts became known to the police, extradition proceedings were taken to bring him back to New York to answer the charge of assault in connection with the shooting of Hintz.

It is most important, therefore, to determine whether or not the said Sheridan in his affidavit and in his testimony is worthy of credence and whether or not a mistake was made in the identification of him, Dunn and Gentile by Hintz.

On the trial, William Hintz, a brother of Anthony Hintz, testified that he was sitting in an automobile in front of the entrance of 61 Grove Street waiting to take his brother, the deceased, to work and that he saw Gentile, whom he had known for eight to ten years, leave the said premises immediately after the shooting. Jacob Kushner, the first officer at the scene, testified he saw William Hintz sitting in the said car upon his arrival.

At the time of the shooting the deceased made spontaneous exclamations in which he stated that Dunn shot him and also told his wife that " Johnny Dunn shot me."

The police thereupon proceeded to the 14th Street labor union office with which Dunn was associated and took him into custody. This was no more than two hours after the actual shooting. The police officer informed Dunn that he was charged with the shooting of Hintz and that he, the police officer, intended to take Dunn to the hospital to be confronted with Hintz. Dunn immediately stated that this would not be fair as Hintz might be delirious and might identify him. At the time of his arrest he was drinking coffee, although he stated he had eaten a hearty breakfast at home at eight o'clock. He also made other statements, the falsity of which was shown by witnesses called on the trial to substantiate his alibi defense. His statement made to the arresting officer was obviously false.

In his opening on the trial, counsel for Sheridan stated that he would prove Sheridan was home at the time of the shooting but no such testimony was given on the trial. No defense whatsoever was offered for the defendant Gentile.

On the trial there was excluded from evidence the testimony as to the identification of Dunn by Hintz at the hospital when Dunn was subsequently brought to the bedside of the dying man. At that time Hintz positively identified Dunn several times and wanted Dunn to look at the injuries which he stated he had sustained at Dunn's hands. It was obvious from the statements made by Hintz at that time that he and Dunn were well acquainted with each other.

Sheridan now states that at the time of the commission of the crime which had been planned by him, he had remained at the Embassy Hotel at 151 Sip Avenue, Jersey City, and he had received a telephone call there and was conversing with the manager of the said hotel at about the time of the shooting. No such evidence was given at the trial and on this motion, Mr. Weinman, the manager of the said hotel, was called as a witness by the defense on this motion and he testified that he recalled that Sheridan had received a telephone call but that this call came in sometime between eight o'clock and nine o'clock. He stated the switchboard was not open until after eight o'clock. The assault took place at twenty minutes to eight. The evidence on the trial disclosed the fact that Sheridan lived no more than four and one-half miles through the Holland Tunnel from the scene of the shooting, so that it becomes perfectly apparent that he could, in an automobile, get to his home from the scene of the shooting within a very short time and still take the telephone call after eight o'clock.

In addition thereto, Sheridan testified on this motion that he went to the union headquarters on 14th Street shortly after 10:00 A.M. and that at that time he was wearing a brown suit. When informed that the police officer had tried a brown hat and a brown coat on Dunn at the time he was taken into custody, Sheridan went to his home in Jersey City and changed from his brown suit to a blue suit.

John Duff whom Sheridan puts at the scene of the shooting in place of himself is dead and Jeff La Porte whom Sheridan puts at the scene as a substitute for Dunn has not been seen since he left Sheridan in Florida around January 15, 1947. Undoubtedly, he also is dead.

Charley Yanowsky from whom Sheridan testified he obtained the guns and the automobile was shot and killed on July 16, 1948. So that two of the individuals implicated by Sheridan in the crime are dead and the third, La Porte, is undoubtedly dead also.

La Porte, according to Sheridan's testimony, was about 5 feet 5½ inches in height and weighed between 150 and 160 pounds, whereas the proof showed he was merely 5 feet 3½ inches. Duff, according to Sheridan, was 5 feet 7 inches tall, whereas the picture of Duff produced by the Department of Correction shows him to be a man 6 feet tall. The defendant Dunn is 5 feet 7 inches tall and weighs 145 pounds. Dunn and La Porte are of different nationalities. Dunn has a distinct cast in his left eye and was known as " cockeyed Dunn ". There is no resemblance between Dunn and La Porte and there is no evidence in the case that Hintz even knew La Porte. There could be no mistake in the identification as between Duff and Gentile.

The police searched Sheridan's rooms at the time they were seeking him to take him into custody and found therein an envelope which had contained a Pullman reservation from Florida. On the envelope was written Dunn's telephone number which was listed in the name of his wife, Anna.

Sheridan has a long police record. When he was twelve years old he was sent to the Catholic Protectory for what would have been larceny if committed by an adult. On March 13, 1917, he was convicted of petit larceny in Special Sessions when he was seventeen years of age and was placed on probation. Within two months after that he was convicted of petit larceny in Special Sessions and on April 21, 1917, was sent to the House of Refuge. On September 30, 1919, for violation of section 1897 of the Penal Law, namely, the possession of a pistol, he was again sent to the House of Refuge. On November 17, 1919, he was transferred to the Penitentiary. The weapon involved was a loaded pistol. He was paroled from the Penitentiary on December 4, 1920.

On December 30, 1920, he was convicted of robbery second degree in General Sessions and was sentenced to State's prison for from seven and one-half to fifteen years. He and two accomplices held up the proprietor of a clothing store with guns. He was paroled on January 26, 1926. On December 19, 1927, he was indicted for carrying concealed weapons after the commission of a crime and was returned to State prison for violation of parole. Paroled on December 27, 1929, he was again indicted on July 14, 1930, for carrying concealed weapons after the commission of a crime and felonious assault first and second degrees,

and was sentenced to State's prison for a term of seven years by Judge ROSALSKY. In that case he was in an automobile with two others in which were found several guns and ninety-seven rounds of ammunition and at the time of his arrest he attempted to shoot a police officer who, in turn shot him. He admitted on this motion that at that time he was lying in wait for a hijacker who had stolen a truck containing liquor.

For years his legitimate income consisted merely of $35 salary in the labor union and he refused to divulge the source of his other income on the ground that it might incriminate him for filing false income tax returns.

He testified on this proceeding that he buys guns whenever he gets a chance, uses them and throws them away; that he had bought hundreds of them, some for resale. He testified he never had any business with Dunn in his life outside of being a union official with him. He further testified " We used to buy guns and throw them in the place so that we would have them whenever we would use them."

He was asked this question: " It was not anything unusual to be discussing taking a man's life?" Answer: " No. I have no regrets."

He admitted on this proceeding to have lied to his attorney and that he also lied on the extradition proceedings in which he refused to leave Florida voluntarily to answer the charge of assault against Hintz. He has led the life of a racketeer, has been a gangster since he was seventeen, a beer runner, a stick-up man, a killer. Duff and La Porte were stick-up men. He did not tell his lawyer the truth. He further testified in the extradition proceedings that he did not know Hintz was to be shot and that " he wouldn't know the fellow if he walked in this room." A stick-up never gave him any qualms of conscience and he has no qualms of conscience for coldly and brutally murdering Andrew Hintz, no repentence or remorse for the killing. The last time he saw Duff alive was when he left for Florida and his entire income other than the $35 received from the labor union was from illegal enterprises.

In the extradition proceeding he stated that the telephone call he received on the morning of January 8th was received from the New York office of the union on 14th Street and 8th Avenue. This is the place where Johnny Dunn had his office. In this proceeding on being confronted with this testimony he stated that on that morning he received two calls.

Sheridan's testimony comes from a polluted source and should be most carefully scrutinized.

The brazen recital of the details of the cold-blooded murder of Anthony Hintz falsely testified to as having been related to Sheridan by the alleged actual killers is most convincing proof that the deceased, and the witnesses produced upon the trial, told the truth and points the finger of condemnation to Sheridan as being one of the actual participants in the murder, the responsibility of which he now assumes but the actual participation in which he now denies.

One who has all his life committed crimes of violence who would not hesitate to attempt to shoot down decent police officers performing their honorable duty and who admits that he has led a life of crime ever since he was a juvenile of twelve years, who boasts that he has been a stick-up man, a dealer in guns, a beer runner, racketeer and thief and an associate of murderers and a murderer himself is unworthy of belief.

He is now making an abortive attempt to salvage from an inevitable doom his fellow murderers by resorting to a well-known trick of the underworld of substituting for guilty participants dead men whose lips are sealed. The creditable evidence produced upon the trial cries out in contradiction of his recital.

The solution of the brutal murder of Anthony Hintz reflects great credit upon our police department and the case was admirably presented by the District Attorney.

To set aside the conviction of these two defendants, Dunn and Gentile, obtained before a special panel of jurors after a fair trial and whose conviction has since been affirmed unanimously by the Court of Appeals, upon the affidavit and the false testimony of an admitted gunman and murderer to whom the last door of escape from just punishment has been closed and whose recital is based upon the alleged statements of racketeer gunmen, now dead or missing for over twenty-one months, would be a mockery of justice and make of the administration of the law a farce.

Motion denied.